Meriel L. Darzen, OSB # 113645
(503) 525-2725 │ meriel@crag.org
Oliver J. H. Stiefel, OSB # 135436
(503) 227-2212 │ oliver@crag.org
CRAG LAW CENTER
3141 E. Burnside St.
Portland, Oregon 97214
Fax: (503) 296-5454

*Attorneys for Plaintiff Klamath Forest Alliance*

# UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## MEDFORD DIVISION

| | |
|---|---|
| **KLAMATH FOREST ALLIANCE**, a California non-profit corporation;<br><br>        Plaintiff,<br><br>    v.<br><br>**SCOTT J. BLOWER**, in his official capacity as Wild Rivers District Ranger; **MERV GEORGE JR.**, in his official capacity as Rogue River-Siskiyou National Forest Supervisor; and the **UNITED STATES FOREST SERVICE**,<br><br>        Defendants. | Case No. 1:21-cv-00781<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**<br><br>(5 U.S.C. § 706(2))<br><br>(Environmental Matters – Endangered Species Act, National Forest Management Act, National Environmental Policy Act, and Administrative Procedure Act) |

## NATURE OF ACTION

1.      Plaintiff Klamath Forest Alliance ("KFA") brings this challenge under the

Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–706, to the final administrative actions

of Scott J. Blower, Merv George Jr., and the United States Forest Service (collectively "Forest

Service" or "Defendants"). In approving the Decision Memorandum ("DM") for the Slater Fire

Safe Re-entry Project ("Slater Roadside Project" or "Project") on the Rogue River-Siskiyou

National Forest ("Forest" or "RRSNF"), Defendants acted arbitrarily, capriciously, and contrary

to the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321–4370h, the National

Forest Management Act ("NFMA"), 16 U.S.C. §§ 1600–1614, and the Endangered Species Act

("ESA"), 16 U.S.C. §§ 1531–1544.

2.      The DM authorizes the felling of "danger" trees (also called "hazard" trees)

affected by the 2020 Slater Fire along approximately 146 miles of identified travel corridors, and

the restoration and rehabilitation of site conditions through site-specific seeding and planting of

native grasses, shrubs, and trees in identified roadsides and other areas affected by high intensity

burn.

3.      Under NEPA, the Forest Service did not prepare an Environmental Impact

Statement ("EIS") or even a less intensive Environmental Assessment ("EA"), and instead

approved the Project pursuant to two Categorical Exclusions ("CE"). CEs apply to categories of

actions that the Forest Service has determined pose no significant environmental effects, either

individually or cumulatively. The Forest Service approved the roadside tree felling portions of

the Project pursuant to a CE applicable to "repair and maintenance" of roads. 36 C.F.R.

§ 220.6(d)(4). The Forest Service approved the restoration and rehabilitation portions of the

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF—2

Project pursuant to a CE applicable to "post-fire rehabilitation activities." *Id.* § 220.6(e)(11). KFA does not challenge the restoration and rehabilitation portions of the Project.

4.       KFA challenges the application of the "road repair and maintenance" CE to a project of this magnitude. Along 85 miles of road—covering approximately 4,106 acres—trees would be felled if they are (1) within 200 feet of the roadway, and (2) pose some hazard risk in the next five years. Most of these felled trees would be removed pursuant to commercial timber sale contracts, producing an estimated 30 million board feet of timber. The Forest Service has failed to articulate a rational explanation as to why such a major "salvage" logging project constitutes "road repair and maintenance" such that the Forest Service may avoid preparation of an EIS or even an EA.

5.       KFA acknowledges that felling of some danger trees along some travel corridors is necessary for the safety of the public and agency personnel, and the Forest already has conducted operations to address specific danger trees that pose immediate threats to human life and property pursuant to an emergency response. Now, however, the Forest Service has planned and authorized a major logging project targeting tens of thousands of trees posing no immediate hazard risk. Before approving a project of this magnitude, the Forest Service is obligated to prepare an EIS or EA.

6.       Proper review under an EIS or EA would force the Forest Service to take a "hard look" at the Project's environmental impacts, including impacts to ESA-listed northern spotted owls and important habitat classified as "Late Successional Reserves." In fact, the Forest Service concedes that the Project is "likely to adversely affect" owls, but failed to inform the public and decisionmaker of the scope and magnitude of the impacts or consider any alternatives that would lessen such impacts. Nor did the Forest Service engage in required consultation with the expert

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF—3

wildlife agency, the U.S. Fish and Wildlife Service, pursuant to Section 7 of the ESA. And the Forest Service did not evaluate the Project's impacts to Late Successional Reserves at all.

7.     KFA respectfully requests this Court to vacate the DM and remand to the Forest Service for preparation of an EIS or EA for a full and fair analysis of the Project's impacts.

8.     If necessary, KFA intends to seek narrowly tailored injunctive relief during the pendency of this litigation to protect sensitive species and their habitats but which would still permit the felling of any remaining hazardous trees posing an imminent risk along essential public travel corridors.

9.     Should it prevail, KFA will seek attorneys' fees and costs pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412, the ESA, 16 U.S.C. § 1540(g)(4), and/or any other applicable authorities.

## JURISDICTION AND VENUE

10.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Plaintiff's claims present a federal question. A present, actual, and justiciable controversy exists between the parties. The requested relief for a declaratory judgment is proper under 28 U.S.C. § 2201, and the requested injunctive relief is proper under 28 U.S.C. § 2202.

11.     Plaintiff exhausted its administrative remedies by submitting scoping comments. The challenged agency action is subject to this Court's review under 5 U.S.C. §§ 702, 704, and 706. Defendants have waived sovereign immunity in this action pursuant to 5 U.S.C. § 702.

12.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because the Project area is located within this judicial district. Defendants maintain an office in this judicial district.

13.     This case is properly filed in the Medford Division pursuant to Local Rule 3-2 because a substantial part of the Project area, and Defendants' office where the decision was

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF—4

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

signed, are located in Josephine County. A substantial part of the events or omissions giving rise to this claim occurred and the property that is subject to this action is situated in the Medford Division.

## PARTIES

### Plaintiff

14.     Plaintiff KLAMATH FOREST ALLIANCE ("KFA") is a non-profit community organization founded in 1989, based in Orleans, California. KFA has 500 members and supporters. Its mission is to promote sustainable ecosystems and sustainable communities of the Klamath-Siskiyou Mountain region. KFA participates in forest planning through agency engagement, substantive comments, and collaboration. KFA uses law, science, place-based knowledge and conservation advocacy to defend the biodiversity, wildlife, waters, and mature forests of the Klamath-Siskiyou bioregion. KFA's members and supporters use and enjoy the Project area and would be irreparably harmed if the Project moves forward.

15.     Plaintiff's members and supporters regularly visit and enjoy the Forest, including the Project area, and intend to do so again in the near future. The members and supporters appreciate the aesthetics of the Forest, including its waters and wildlife, and use the area to engage in recreational, scientific, and spiritual activities, such as hunting, hiking, camping, fishing, photography, watershed research, and observing wildlife.

16.     Plaintiff has organizational interests in the proper and lawful management of the Forest. Plaintiff and its members and supporters have participated extensively in relevant administrative actions and have actively participated in the Project's administrative process.

17.     Plaintiff, its members, supporters, and staff would sustain injury to aesthetic, educational, recreational, spiritual, and scientific interests if the Project proceeds as authorized.

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF—5

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

Plaintiff, its members, supporters, and staff have concrete plans to return to the area where the Project is proposed. Unless this Court grants the requested relief, Plaintiff, its members, supporters, and staff will be adversely and irreparably harmed by the Project.

**Defendants**

18.     Defendant SCOTT J. BLOWER is the Wild Rivers District Ranger for the Forest. Mr. Blower is the Responsible Official for the Project, and he signed the Decision Memorandum, constituting the final administrative action. As Wild Rivers District Ranger, Mr. Blower has the responsibility to ensure that the Project is consistent with applicable laws and regulations. Plaintiff brings this action against Mr. Blower in his official capacity.

19.     Defendant MERV GEORGE JR. is the Forest Supervisor for the Forest. Upon information and belief, Mr. George authorized Mr. Blower to sign the Decision Memorandum. As Forest Supervisor, Mr. George has the responsibility to ensure that all projects on the Forest are consistent with applicable laws and regulations. Plaintiff brings this action against Mr. George in his official capacity.

20.     Defendant the UNITED STATES FOREST SERVICE is an agency within the United States Department of Agriculture entrusted with the management of our national forests. The Forest Service is headquartered in Washington, D.C., and it has nine regions across the country. The national forests of Oregon are in Region 6. All or a significant portion of the actions and omissions alleged in this Complaint occurred in Region 6.

## LEGAL BACKGROUND

**National Environmental Policy Act**

21.     Congress enacted NEPA to "declare a national policy which will encourage productive and enjoyable harmony between man and his environment; to promote efforts which

*Crag Law Center
3141 E Burnside St.
Portland, OR 97214
Tel. (503) 227-2212*

will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man; [and] to enrich the understanding of the ecological systems and natural resources important to the Nation." 42 U.S.C. § 4321.

22.    To accomplish these purposes, NEPA requires all agencies of the federal government to prepare a "detailed statement" for all "major federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). Commonly known as the Environmental Impact Statement or EIS, the detailed statement must describe, *inter alia*, the adverse environmental impact of the proposed action and alternatives to the proposed action. *Id.*

23.    NEPA further requires federal agencies to "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources." *Id.* § 4332(2)(E).

24.    The Council on Environmental Quality ("CEQ") promulgated regulations implementing NEPA and elaborating on the requirements of an EIS. 42 U.S.C. § 4342 (establishing CEQ); 40 C.F.R. §§ 1500–1508 (2019) (CEQ's NEPA regulations). CEQ modified the NEPA regulations by final rule on July 16, 2020. 40 C.F.R. §§ 1500–1508 (2020).

25.    On his first day of office, President Biden issued Executive Order 13990: Protecting Public Health and the Environment and Restoring Science to Tackle the Climate Crisis.[1] The policy statement of EO 13990 provides that the policy of the Biden Administration is to, *inter alia*, listen to the science and to improve public health and protect our environment. EO 13990 directs the heads of all agencies to immediately review all existing regulations, orders,

---

[1] *Available at h*ttps://www.whitehouse.gov/briefing-room/presidential-actions/2021/01/20/executive-order-protecting-public-health-and-environment-and-restoring-science-to-tackle-climate-crisis/

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF—7

guidance documents, policies, and any similar agency actions promulgated, issued, or adopted

between January 20, 2017, and January 20, 2021 that are inconsistent with the policy statement.

26.     The Biden Administration provided a non-exclusive list of agency actions that the

heads of relevant agencies will review in accordance with EO 13990. *See* Fact Sheet: List of

Agency Actions for Review.[2] The modification to the CEQ regulations is on the list.

27.     The heads of some executive agencies and departments already have taken action

pursuant to EO 13990. *See, e.g.*, Secretary of the Interior Order ("SO") No. 3399: Department-

Wide Approach to the Climate Crisis and Restoring Transparency and Integrity to the Decision-

Making Process.[3] SO 3399 provides that "Bureaus/Offices will not apply the 2020 Rule in a

manner that would change the application or level of NEPA that would have been applied to a

proposed action before the 2020 Rule went into effect on September 14, 2020." A similar

directive applicable to the Forest Service/U.S. Department of Agriculture may be forthcoming.

28.     Under the 2020 NEPA regulations, agencies are to determine the appropriate level

of NEPA review for a given project. 40 C.F.R. § 1501.3 (2020). Agencies must determine

whether the proposed action: (1) Normally does not have significant effects and is categorically

excluded; (2) is not likely to have significant effects or the significance of the effects is unknown

and is therefore appropriate for an environmental assessment ("EA"); or (3) is likely to have

significant effects and is therefore appropriate for an EIS. *Id.*

29.     CEQ regulations direct federal agencies to identify in their NEPA procedures

certain categories of actions that normally do not require preparation of an EA or EIS. *See* 40

C.F.R. § 1501.4(a) (2020); 40 C.F.R. § 1508.4 (2019). The Forest Service promulgated a series

---

[2] *Available at* https://www.whitehouse.gov/briefing-room/statements-releases/2021/01/20/fact-sheet-list-of-agency-actions-for-review/

[3] *Available at* https://www.doi.gov/sites/doi.gov/files/elips/documents/so-3399-508_0.pdf

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF—8

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

of categorical exclusions pursuant to the previous version of the CEQ regulations, which defined "categorical exclusion" as a "category of actions which do not individually or cumulatively have a significant effect on the human environment and which have been found to have no such effect by a federal agency in implementation of these regulations. 40 C.F.R. § 1508.4 (2019); 57 Fed. Reg. 43,180 (Sept. 18, 1992) (establishing categories); 73 Fed. Reg. 43,084 (July 24, 2008) (placing established categories under Forest Service NEPA regulations at 36 C.F.R. Part 220).

30.    36 C.F.R. § 220.6(a) provides that a proposed action may be categorically excluded from further analysis and documentation in an EIS or EA only if there are no extraordinary circumstances related to the proposed action and if it is within one of the categories established by the Secretary or it is within a category listed in Section 220.6(d) and (e).

31.    36 C.F.R. § 220.6(b) lists the resource conditions that should be considered in determining whether extraordinary circumstances related to a proposed action warrant further analysis and documentation in an EA or EIS, including "Federally listed threatened or endangered species or designated critical habitat, species proposed for Federal listing or proposed critical habitat, or Forest Service sensitive species." *Id.* § 220.6(b)(1)(i). According to 36 C.F.R. § 220.6(b)(2), the "mere presence of one or more of the resource conditions does not preclude use of a categorical exclusion; it is the existence of a cause-effect relationship between a proposed action and the potential effect on these resource conditions, and if such a relationship exists, the degree of potential effect of a proposed action on these resource conditions that determines whether extraordinary circumstances exist."

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF—9

32.     36 C.F.R. § 220.6(d) lists the categories of actions for which a project or case file and decision memo are not required. One such category is the repair and maintenance of roads, trails, and landline boundaries. *Id.* § 220.6(d)(4). Examples include, but are not limited to:

    (i)     Authorizing a user to grade, resurface, and clean the culverts of an established National Forest System road;

    (ii)    Grading a road and clearing the roadside of brush without the use of herbicides;

    (i)     Resurfacing a road to its original condition;

    (i)     Pruning vegetation and cleaning culverts along a trail and grooming the surface of the trail; and

    (i)     Surveying, painting, and posting landline boundaries.

33.     36 C.F.R. § 220.6(e) lists the categories of actions for which a project or case file and decision memo are required. One such category is post-fire rehabilitation activities, not to exceed 4,200 acres (such as tree planting, fence replacement, habitat restoration, heritage site restoration, repair of roads and trails, and repair of damage to minor facilities such as campgrounds). *Id.* § 220.6(e)(11).

34.     Another such category is salvage of dead and/or dying trees not to exceed 250 acres, requiring no more than ½ mile of temporary road construction. 36 C.F.R. § 220.6(e)(13). Examples include, but are not limited to:

    (i)     Harvest of a portion of a stand damaged by a wind or ice event and construction of a short temporary road to access the damaged trees; and

    (ii)    Harvest of fire-damaged trees.

35.     Forest Service regulations require "scoping" for all Forest Service proposed actions, including those that would be categorically excluded from further analysis and documentation in an EA or EIS. 36 C.F.R. § 220.4(e)(1). "If the responsible official determines,

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

based on scoping, that it is uncertain whether the proposed action may have a significant effect on the environment," the Forest Service must prepare an EA. 36 C.F.R. § 220.4(e)(2). "If the responsible official determines, based on scoping, that the proposed action may have a significant environmental effect," the Forest Service must prepare an EIS. *Id.*

**National Forest Management Act (NFMA)**

36.     The Forest is part of the National Forest System and is therefore subject to NFMA and its planning regulations.

37.     Pursuant to NFMA, management of National Forests occurs at two levels: forest and project. At the forest level, NFMA requires the Secretary of Agriculture to "develop, maintain, and, as appropriate, revise land and resource management plans for units of the National Forest System." 16 U.S.C. 1604(a).

38.     The Forest Service, which manages the National Forest System, uses these plans, called "forest plans," to guide all natural resource management activities, including use of the land for outdoor recreation, range, timber, watershed, wildlife and fish, and wilderness. 36 C.F.R. § 219.1 (2000); 16 U.S.C. § 1604(e)(1). A forest plan is a broad, long-term programmatic planning document for the entire forest, containing goals and objectives for individual units of the forest and providing standards and guidelines for management of forest resources.

39.     At the project level, once a forest plan is in place, site-specific actions or "projects" are planned and evaluated by the Forest Service. Each site-specific project must be consistent with the governing forest plan. 16 U.S.C. § 1604(i).

40.     In 1989 and 1990, the Forest Service adopted the Siskiyou and Rogue National Forest Land and Resource Management Plans, respectively (collectively "Forest Plan"), which provides standards and guidelines for project-level planning within the Forest.

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF—11

41.    In 1994, the Forest Service and the Bureau of Land Management adopted the Record of Decision for the Northwest Forest Plan ("NWFP"). The NWFP established management requirements for all Forest Service and Bureau of Land Management land within the range of the northern spotted owl. The NWFP contains mandatory standards relating to the protection of northern spotted owls.

42.    The Forest is within the range of the northern spotted owl; the Forest Plan has been amended to include the management direction included in the NWFP.

43.    All management activities, actions, and projects on the Forest must comply with the Forest Plan and NWFP. In the event that there are differences in management direction between the two documents, the more restrictive of the two documents governs.

**Endangered Species Act**

44.    Congress enacted the ESA "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved" and to "provide a program for the conservation of such endangered species and threatened species, and to take such steps as may be appropriate." 16 U.S.C. § 1531(b).

45.    To achieve these purposes, the Secretaries of Commerce and the Interior are responsible for administering and enforcing the ESA. 16 U.S.C. § 1532(15). The Secretaries of Commerce and the Interior delegated this responsibility to the National Marine Fisheries Service ("NMFS") and the Fish and Wildlife Service ("FWS") (collectively, the "Services"), respectively. 50 C.F.R. § 402.02(b). FWS administers the ESA as to terrestrial and freshwater species, and NFMS administers the ESA as to marine species.

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

46.     The ESA makes it unlawful to "take" any "endangered" species and certain "threatened" species for which protective regulations have been promulgated. 16 U.S.C. §§ 1538(a)(1), 1533(d).

47.     Take means to "harass, harm, pursue, hunt, wound, kill, trap, capture, or collect or attempt to engage in any such conduct" with a listed species. 16 U.S.C. § 1532(19). Harm means "an act which actually kills or injures wildlife. Such act may include significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding or sheltering." 50 C.F.R. § 17.3.

48.     An "endangered species" is "any species which is in danger of extinction throughout all or a significant portion of its range . . . ." 16 U.S.C. §1532(6). A "threatened species" is "any species which is likely to become endangered within the foreseeable future throughout all or a significant portion of its range." 16 U.S.C. §1532(20).

49.     Section 7 of the ESA imposes substantive and procedural obligations on federal agencies like the Forest Service. Substantively, Section 7 provides that federal agencies must "insure that any action authorized, funded, or carried out by such agency * * * is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the adverse modification of habitat of such species * * * determined * * * to be critical." 16 U.S.C. § 1536(a)(2).

50.     Procedurally, Section 7 requires federal agencies (the "action agency") to engage in consultation with the applicable Service before undertaking a discretionary action that may affect listed species or critical habitat. 16 U.S.C. § 1536(a)(2).

51.     Section 7 consultation is either informal or formal. Informal consultation is a process designed to help the action agency determine whether to engage in formal consultation.

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

40 C.F.R. § 402.13. If the action agency determines that the proposed action may affect, but is "not likely to adversely affect" ("NLAA") listed species or critical habitat, and the appropriate Service concurs in writing, formal consultation is not required. 50 C.F.R. § 402.14(b)(1).

52.    If the action agency decides that the action may affect, and is likely to adversely affect ("LAA") a listed species, the action agency must engage in formal consultation with the appropriate Service. 50 C.F.R. § 402.14(a). Formal consultation also is required if the consulting agency does not concur in writing with the action agency's NLAA determination. 50 C.F.R. § 402.14(b).

53.    During formal consultation, the appropriate Service must "formulate its biological opinion as to whether the action, taken together with cumulative effects, is likely to jeopardize the continued existence of listed species or result in the destruction or adverse modification of critical habitat." 50 C.F.R. § 402.14(g)(4). The biological opinion ("BiOp") must be based on the best available science and commercial data. 16 U.S.C. § 1536(a)(2).

54.    The BiOp must include: A summary of the information on which the BiOp is based; a detailed discussion of the environmental baseline of the listed species and critical habitat; a detailed discussion of the effects of the action on listed species and critical habitat; and the Service's "jeopardy" opinion. 50 C.F.R. § 402.14(h)(1).

55.    In formulating its "jeopardy" opinion, the Service must, *inter alia*, add the effects of the action and cumulative effects to the environmental baseline. 50 C.F.R. § 402.14(g).

56.    If the Service determines that the action is "likely to jeopardize the continued existence of a listed species or result in the destruction or adverse modification of critical habitat," the BiOp must include reasonable and prudent alternatives. *Id.* § 402.14(h)(1)(2).

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF—14

57.    The Service must issue an incidental take statement to the action agency if after formal consultation, the Service concludes that the proposed action will result in take but is not likely to jeopardize a listed species or adversely modify critical habitat. 16 U.S.C. § 1536(b)(4). The incidental take statement must specify: The impact, *i.e.*, the amount or extent, of the incidental taking on the species; reasonable and prudent measures necessary or appropriate to minimize the impact; and terms and conditions that must be complied with by the action agency to implement the specified measures. 16 U.S.C. § 1536(b)(4)(C); 50 C.F.R. § 402.14(i).

58.    If the level of incidental take authorized by the incidental take permit is exceeded, either the action agency or the Service must reinitiate formal consultation. 50 C.F.R. § 402.16.

59.    Where emergency circumstances mandate the need to consult in an expedited manner, consultation may be conducted informally through alternative procedures. 50 C.F.R. § 402.05(a). This provision applies to situations involving acts of God, disasters, casualties, national defense, or security emergencies, etc. *Id.*

60.    Formal consultation must be initiated as soon as practicable after the emergency is under control. *Id.* § 402.05(b).

61.    After the initiation of consultation, the action agency shall not make any irreversible or irretrievable commitment of resources which has the effect of foreclosing the formulation or implementation of any reasonable and prudent alternative. 16 U.S.C. § 1536(d).

**Administrative Procedure Act**

62.    The APA confers a right of judicial review on any person adversely affected by agency action within the meaning of a relevant statute. 5 U.S.C. § 702. Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in court are subject to judicial review. 5 U.S.C. § 704.

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF—15

63.     Upon review under the APA, a court shall "hold unlawful and set aside agency action * * * found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law * * *." 5 U.S.C. § 706(2). Furthermore, when an agency has taken action without observance of the procedure required by law, that action will be set aside. 5 U.S.C. § 706(2)(D).

## FACTUAL BACKGROUND

64.     The Rogue River-Siskiyou National Forest is located in Southern Oregon and Northern California and ranges from the crest of the Cascade Range west into the Siskiyou Mountains, covering almost 1.8 million acres. The name "Rogue River" commemorates the Takelma tribe, whose defense of their homeland led early French-Canadian trappers to call them les Coquins, meaning "the Rogues."

65.     The Siskiyou Forest Reserve was established by President Theodore Roosevelt in 1905, and the Reserve was designated as the Siskiyou National Forest in 1907. The name "Siskiyou" is a Cree word for "bob-tailed horse" (bestowed in 1828 by French Canadians working for the Hudson Bay Company). The formerly separate Rogue River and Siskiyou National Forests were administratively combined in 2004.

66.     The varied geological substrate and the climatic extremes of the Siskiyou Mountains provide a range of niches for a rich diversity of geologic material. The Siskiyou Mountains present a biological treasure trove of varied and unique species. There are 28 different coniferous species, and numerous rare and endemic plants found in the Siskiyous.

67.     The Forest is home to numerous fish and wildlife species, including coastal marten, coho salmon, and northern spotted owl.

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

68.    The 2020 Slater Fire started on September 8, 2020 on the Klamath National

Forest (cause under investigation). Shortly after it began, it made a run over the Siskiyou Crest,

fueled by a historic wind event of very strong east winds, into the Wild Rivers Ranger District of

the Rogue River-Siskiyou National Forest. The Slater Fire burned approximately 65,306 acres on

the Wild Rivers Ranger District, out of a total of approximately 157,270 acres burned.

69.    Most of the fire's growth occurred very rapidly, growing to almost 100,000 acres

in the first 24 hours. Severe fire weather conditions caused extreme fire behavior that quickly

overwhelmed the community of Happy Camp, California, destroying 197 residences and

tragically killing two residents.

70.    The fire burned at mixed severity; according to RAVG mapping of the 65,306

acres that burned on the Rogue-Siskiyou National Forest, 42% burned at less than 25% basal

area mortality, 10% burned at 25%–50% basal area mortality, 11% burned at 50%–75% basal

area mortality, and 37% burned at greater than 75% basal area mortality. The majority of the

high severity fire occurred on the Klamath National Forest portions of the Slater Fire.

71.    Upon information and belief, during the Slater Fire, the Forest Service conducted

fire suppression activities on the RRSNF that included felling of hazard trees along roads. Upon

information and belief, hazard trees also were felled along powerlines managed by PacifiCorps.

72.    The Slater Fire was declared 100% contained on November 16, 2020.

73.    The Forest Service completed a Burned Area Emergency Response ("BAER")

Report and Defendant George requested funding for carrying out selected treatments. A "Burned

Area Emergency" is a "situation when human life or safety, property, or critical natural or

cultural resources are at an imminent and unacceptable risk due to post-wildfire related threats."

Funding from the Forest Service Regional Office for an "interim emergency stabilization

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF—17

request" was approved on November 4, 2020. "Emergency Stabilization" comprises "actions to

stabilize and prevent unacceptable degradation to natural and cultural resources, to minimize

threats to life or property resulting from the effects of a fire, or to repair/replace/construct

physical improvements necessary to prevent degradation of land or resources."

74.    An initial BAER funding request was approved on October 16, 2020 to address

immediate need for road hazard signs at 26 locations to mitigate human life and safety concerns.

75.    Treatment activities per the BAER included hazard tree removal at select high-use

areas including campgrounds, Sno-Parks, trailheads, parking areas, and certain roads.

76.    Upon information and belief, fire suppression, BAER treatments, and other

activities that involved hazard tree removal along roads were carried out pursuant to emergency

authorities; this work was exempted from the requirements of NEPA. Pursuant to this work, 2.5

miles of Forest Road 48, also known as Grayback Road, also known as Takilma-Happy Camp

Road were treated.

77.    The Forest Service determined that after the emergency response activities were

completed, additional hazard tree felling work would be needed. There are approximately 237

miles of roads within the footprint of the Slater Fire in the RRSNF. To address the roads and

road segments not addressed during emergency response activities, the Forest Service conducted

a planning process pursuant to guidance in the Forest Service Manual.

78.    On January 18, 2021, the Forest Service released a Scoping Report entitled,

"Proposed Action Slater Fire Safe Re-Entry Project." On February 17, 2021, Plaintiff KFA

timely submitted scoping comments to the Forest Service regarding the information in the

Scoping Report.

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF—18

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

79.     KFA requested that the Forest Service, *inter alia*, (1) retain all living trees within the fire area; (2) use a higher predicted probability of mortality for distinguishing between live, and dead and dying trees; (3) assess the effectiveness of post-fire mortality prediction in previous logging treatments; (4) limit activities to the purpose and need of public safety and the safe re-entry of public road systems; (5) implement mitigation measures to ensure consistency with habitat objectives for lands allocated to late-forest conditions; (6) and prepare a full EIS or EA because the CE for road maintenance and repair is inappropriate for a project of this scale. KFA also requested that Forest Service staff be responsible for identifying and marking danger trees for removal, rather than timber sale contractors who have a vested interest in taking more trees.

80.     KFA's Conservation Director, Luke Ruediger, repeatedly requested of the Forest Service the opportunity to visit the project area. Given Forest Service closures and high-elevation winter conditions, the public had no opportunity to review the effects of the Slater Fire on the RRSNF and the areas proposed for treatment. As such, the public could not fully address the potential environmental effects of the project during the commenting period.

81.     Mr. Ruediger was not provided with the opportunity to review the Project area prior to the Forest Service's final decision.

82.     On April 9, 2021, Wild Rivers District Ranger Scott J. Blower signed the Decision Memorandum ("DM") approving the Slater Fire Safe Re-entry Project ("Slater Project"). The DM was posted publicly on the Forest Service's website on April 13, 2021. The Project area is within the Wild Rivers Ranger District of the Forest within Josephine County, Oregon, and Siskiyou and Del Norte Counties, California.

83.     The DM authorizes the felling of "danger" trees affected by the 2020 Slater Fire along approximately 146 miles of identified travel corridors and the restoration and rehabilitation

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

of site conditions through site-specific seeding and planning of native grasses, shrubs, and trees in identified roadsides and other areas impacted by high intensity burn.

84.    More specifically, the DM authorizes the felling of hardwood and conifer trees within 1.5 tree lengths of the roadway—equating to 200 feet—that are defined as "Danger Trees," with potential failure ratings of "imminent," "likely," or "dead/dying that will become danger trees within 5 years." "Danger trees" are those that have the potential to fail and fall onto the roadway or sites of concentrated public use, per the 2016 *Field Guide for Danger-Tree Identification and Response along Forest Roads and Work sites in Oregon and Washington*.

85.    Along with fire-killed trees, the DM authorizes felling of trees with multiple defects, such as those occurring in root disease centers or having stem decay before the fire. In addition to dead trees and other trees with failure indicators, the Forest Service proposes to fell trees that may succumb to mortality in three to five years. These are live trees that may have some level of delayed mortality. To determine which live trees to fell, the Forest Service developed prescriptions based on Smith and Cluck (2011), *Marking Guidelines for Fire-Injured Trees in California*.

86.    Smith and Cluck developed guidelines for predicted mortality rate by species and diameter, based on "crown scorch," or the percentage of a tree's crown (branches and foliage) length killed by the fire. These guidelines recommend felling trees based on the ratio of crown scorch to the size of a tree, based on the species. For example, under the Forest Service's prescriptions for the Project, based on Smith and Cluck, a Ponderosa Pine with a 40-inch diameter would be removed if it has a percentage length of crown scorch greater than or equal to 35%. A White Fir with a 40-inch diameter would be removed if it has a percentage length of

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF—20

crown scorch greater than or equal to 65%. A Douglas Fir with a 40-inch diameter would be removed if it has a percentage length of crown scorch greater than or equal to 70%.

**DM Table 1: Smith and Cluck predicted mortality rate by species and diameter**

| Species | Diameter (Inches) | Remove trees with % length of crown scorch greater than or equal to: |
|---------|-------------------|----------------------------------------------------------------------|
| Ponderosa/Jeffrey Pine | 10–30 | 85% |
| | 30–40 | 55% |
| | 40–50 | 35% |
| Sugar Pine | 10–60 | 55% |
| Incense Cedar | 10–60 | 85% |
| White Firs | 10–35 | 80% |
| | 35–60 | 65% |
| Red Firs | 6–40 | 75% |
| Lodgepole Pine | <10 | 5% |
| | 15–20 | 40% |
| Douglas Fir | 10–40 | 70% |

87.    Under these prescriptions, a live tree with a probability of mortality of >50% would be felled. Some trees with a probability of mortality of >50% will not die imminently, within five years, or because of the fire at all. In other words, many trees that the Project authorizes for felling pose no immediate hazard.

88.    More recent guidelines for predicted mortality rates have been published that are applicable to national forests in Region 6: Hood et al. (2020), *Post-fire Assessment of Tree Status and Marking Guidelines for Conifers in Oregon and Washington*. The Forest is in Region 6. Hood et al. predicts that fewer trees will die (based on crown scorch) than as predicted by Smith and Cluck.

89.    Pursuant to the Project, danger trees will be felled along roads that are identified as Level 2 through 5 on the Motorized Vehicle Use Map ("MVUM"), meaning that they are open to the general public.

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

90.    Within the areas "primarily" identified as having high overstory tree mortality—along 85 miles of road, covering approximately 4,106 acres—most felled danger trees would be removed. Danger trees identified for removal would be felled using ground-based logging systems, using mechanized heavy equipment to cut and/or skid logs to a landing area. The logs would be decked and then loaded on log trucks for transport. This work is slated to be carried out pursuant to commercial timber sale contracts, producing an estimated 30 million board feet of timber. One board foot is 12"x12"x1" (144 cubic inches). One million board feet is equivalent to roughly 200 logging trucks' worth of timber.

91.    In areas of lower fire severity—along 59 miles of roads, covering approximately 2,662 acres—danger trees will be hand-felled and left on site. Felling trees and leaving them on site has fewer impacts than felling and removing trees. In total, the Slater Project will result in the felling of tens of thousands of trees, and the removal of a majority of them.

92.    The DM describes other "connected actions." Actions are connected if they automatically trigger other actions that may require EISs, cannot or will not proceed unless other actions are taken previously or simultaneously, or are independent parts of a large action and depend on the larger action for their justification.

93.    Road reconstruction and maintenance of existing roads is a "connected action." Road reconstruction may include activities like culvert replacement, surface rock replacement, fill repair, stabilization, bridgework, and infrastructure repair. Road maintenance may include activities like roadside brushing, grading, and ditch cleaning. Fuel reduction is also a connected action.

94.    Following danger tree removal, sites within the identified high intensity burn area (4,106 acres) would be rehabilitated through site-specific actions including the seeding and

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF—22

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

planting of native grasses, shrubs, and trees to meet vegetation and erosion control needs. All of the reforestation and revegetation actions are "funding dependent."

95.    Post-fire habitats are inherently fragile. Post-fire logging activities, other than hand-felling select trees and leaving them on site, generally are inconsistent with efforts to restore ecosystem functions after fire. Ground-based logging operations disturb soils, causing erosion, which leads to runoff into streams and the resulting sedimentation of streams and other adverse water quality impacts.

96.    Post-fire logging activities, including the felling and removal of hazard trees and salvage logging, can cause habitat loss and fragmentation for wildlife species, including northern spotted owl.

97.    Northern spotted owls may forage in post-fire forest habitat. This habitat, also called "snag forest" habitat, is a complex and important habitat used by numerous small mammals and birds. Predators, including northern spotted owls, seek out these burned areas due to their abundance of small mammal prey species. Logging activities, including the felling and removal of hazard trees and salvage logging, reduces or eliminates post-fire foraging habitat.

98.    The DM acknowledges that the Project is "likely to adversely affect" northern spotted owl. The Project is within the "disturbance distance" of three historic northern spotted owl "activity centers," which is the approximately 500-acre, or 0.5-mile, radius around a nest site. The Project would remove an estimated 1,052 acres of post-fire foraging habitat.

99.    "Likely to adversely affect" is a term of art used in Endangered Species Act consultations meaning that an adverse effect to a listed species may occur as a direct or indirect result of the proposed action or its interrelated or interdependent actions and the effect is not

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF—23

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

discountable, insignificant, or beneficial. A "likely to adversely affect" determination triggers the requirement to formally consult with the FWS pursuant to ESA Section 7.

100.    The Forest Service did not complete formal Section 7 consultation with FWS prior to approving the Project. The degree of adverse effects on listed species, like northern spotted owl, can present an "extraordinary circumstance" that precludes the use of a CE. The "likely adverse effects" of the Project on northern spotted owl require a more careful and searching review in an EIS or EA.

101.    Post-fire logging activities, including the felling and removal of hazard trees and salvage logging, can inhibit the development of late-forest habitat conditions in burned forests. The lands that will be logged as part of the Project include 2,035.5 acres of "Late Successional Reserves," ("LSRs") designated pursuant to the Northwest Forest Plan.

102.    LSRs are identified with an objective to protect and enhance conditions of late-successional and old-growth forest ecosystems, which serve as habitat for late-successional and old-growth forest related species including the northern spotted owl.

103.    The NWFP restricts logging activities in LSRs, including salvage. Because LSRs have been established to provide high quality habitat for species associated with late-successional forest conditions, management following a stand-replacing event, such as wildfire, should be designed to accelerate or not to impede the development of those conditions. Management planning for salvage in LSRs must acknowledge the considerable value of retaining dead and dying trees in the forest. Limited stand management is permitted, subject to review by the Regional Ecosystem Office.

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF—24

104.    The standards and guidelines governing salvage logging are intended to "prevent negative effects on late-successional habitat," and provide, "salvage operations should not diminish habitat suitability now or in the future."

105.    The standards and guidelines limit the logging of trees within LSRs to trees that were killed by stand replacing events exceeding 10 acres and limit salvage logging to stands where fire or other disturbance has reduced canopy closure to less than 40 percent.

106.    Where green trees, snags, and logs are present following disturbance, the green-tree and snag guidelines must be applied first, and completely satisfied where possible.

107.    The DM does not address the impact of the Project on LSRs at all.

108.    Upon information and belief, the Forest Service did not conduct a DecAID or other analysis for snags and down wood used by wildlife species in the LSRs in the Project area.

109.    Upon information and belief, the Forest Service did not conduct an analysis of whether the Project is consistent with the standards and guidelines applicable to salvage logging operations in LSRs.

110.    On April 16, 2021, after the final decision had been signed, Defendant Blower lead a field tour of a portion of the project area with KFA's conservation director Luke Ruediger and member Serena Barton.

111.    On or about May 18, 2021, the Forest Service posted a "preliminary-advertisement" for the first commercial timber sale in the Project area, the "48 Road DTS DxP." "DxP" means "Designation by Prescription." According to the preliminary advertisement, the Forest Service intends to advertise timber designated for cutting in an area comprising approximately 223 acres. The sale contains an estimated volume of 3.9 million board feet of

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF—25

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

timber. The sale area is concentrated along Forest Road 48, but includes spur roads off of the main road as well.

## FIRST CLAIM FOR RELIEF
### (NEPA and APA Compliance)

112.    Plaintiff re-alleges and incorporates all preceding paragraphs herein by reference.

113.    The Forest Service's failure to prepare an EIS or even an EA before approving the Slater Fire Safe Re-entry Project, violates NEPA, and is arbitrary, capricious, an abuse of discretion, not in accordance with, and without observance of procedure required by law. 5 U.S.C. § 706(2).

### Count 1:        Unlawful Use of Inapplicable Categorical Exclusion

114.    Federal agencies may avoid preparing either an EIS or EA only when the proposed action is "categorically excluded" from NEPA review.

115.    The Forest Service promulgated a series of CEs under NEPA regulations that defined CEs as a "category of actions which do not individually or cumulatively have a significant effect on the human environment." 40 C.F.R. § 1508.4.

116.    36 C.F.R. § 220.6(d)(4) applies to "repair and maintenance of roads, trails, and landline boundaries," with examples including "grading a road and clearing the roadside of brush." When promulgating the regulations, the Forest Service explained that this category applies to "routine repair and maintenance actions." 57 Fed. Reg. at 43,184.

117.    The Forest Service promulgated a separate CE category for post-fire logging activities, but stipulated that such activities cannot exceed 250 acres. 36 C.F.R. § 220.6(e)(13).

118.    The Slater Fire Safe Re-entry Project authorizes over 4,000 acres of commercial logging activities. Marking guidelines allow the vast majority of the trees to be removed from a 400-foot-wide corridor along 85 miles of roads.

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF—26

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

119.    36 C.F.R. § 220.6(d)(4) does not apply to a commercial logging project of this scale, involving the removal of tens of thousands of trees.

**Count 2:**        **Arbitrary Conclusion That No Extraordinary Circumstances Are Present**

120.    Even if the Project would otherwise fall under 36 C.F.R. § 220.6(d)(4), the Forest Service still is required to prepare an EA or EIS because "extraordinary circumstances" exist.

121.    One such "extraordinary circumstance" sufficient to preclude use of a CE is based on the degree of potential effects on federally listed threatened or endangered species. 36 C.F.R. § 220.6(b)(1)(i), (2).

122.    Application of a CE is inappropriate if there is a possibility that an action may have a significant environmental effect.

123.    The Slater Fire Re-entry Project may have a significant environmental effect. In fact, the Forest Service admits that the Project is "likely to adversely affect" Northern spotted owl, a federally listed threatened species.

124.    The Forest Service failed to articulate a rational explanation for its conclusion that no extraordinary circumstances are present.

**SECOND CLAIM FOR RELIEF**
**(NFMA and APA Compliance)**

125.    Plaintiff re-alleges and incorporates all preceding paragraphs herein by reference.

126.    The logging and tree-felling activities authorized by the DM constitute commercial "salvage logging operations" and may also include green tree removal for the purposes of the NWFP.

127.    The Forest Service has a duty to ensure that the Project is consistent with the NWFP and the Forest Plan.

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF—27

128.    The Forest Service has failed to make a rational determination that the proposed commercial salvage logging operations and green tree removal in LSRs is consistent with the NWFP and the Forest Plan.

129.    The Forest Service's failure to explain how the Slater Fire Safe Re-entry Project is consistent with the NWFP and the Forest Plan violates NFMA, and is arbitrary, capricious, an abuse of discretion, not in accordance with, and without observance of procedure required by law. 5 U.S.C. § 706(2).

**THIRD CLAIM FOR RELIEF**
**(ESA Section 7 and APA Compliance)**

130.    Plaintiff re-alleges and incorporates all preceding paragraphs herein by reference.

131.    Plaintiff intends to add a claim under ESA Section 7 upon expiration of the 60-day notice period, if the underlying issues have not been resolved. *See* 16 U.S.C. § 1540(g)(2)(A)(i).

**PRAYERS FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in favor of Plaintiff and issue the following relief:

A.    Declare the Forest Service has violated the National Environmental Policy Act and its implementing regulations by failing to prepare either an EA or EIS;

B.    Declare the Forest Service has violated the National Forest Management Act and its implementing regulations by authorizing a project that is inconsistent with the governing forest plan;

C.    Declare the Forest Service has violated the Endangered Species Act and its implementing regulations by failing to complete Section 7 consultation prior to authorization of the Slater Fire Safe Re-entry Project;

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF—28

D.      Declare the Forest Service's issuance of the DM is arbitrary, capricious, an abuse of discretion, not in accordance with, and/or without observance of procedure required by law under the APA, 5 U.S.C. § 706(2)(A), (D);

E.      Vacate the DM and remand to the Forest Service for additional consideration;

F.      Issue preliminary and permanent injunctive relief prohibiting the Forest Service from authorizing implementation of the Slater Fire Safe Re-entry Project until such time as the Forest Service can demonstrate compliance with the requirements of the National Environmental Policy Act, the National Forest Management Act, the Endangered Species Act, and the Administrative Procedure Act;

G.      Award Plaintiff its reasonable fees, costs, expenses and disbursements, including reasonable attorneys' fees associated with this litigation pursuant to the Equal Access to Justice Act or other applicable statutes; and

H.      Grant such additional relief as the Court deems just and proper.

DATED this 21st day of May, 2021.

Respectfully submitted,

s/ Meriel L. Darzen
Meriel L. Darzen, OSB # 113645
(503) 525-2725 │ meriel@crag.org
Oliver J. H. Stiefel, OSB # 135436
(503) 227-2212 │ oliver@crag.org
CRAG LAW CENTER
3141 E. Burnside St.
Portland, Oregon 97214
Fax: (503) 296-5454
*Attorneys for all Plaintiffs*